IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>KATHERINE ELIZABETH PAIZ,<br><br>Defendant.<br>_____ / | No. CR 06-0710 WHA<br><br>**ORDER AND MEMORANDUM OPINION REGARDING DISCOVERY IN SECTION 2255 PROCEEDING** |

**INTRODUCTION**

In this Section 2255 action, the present questions are (1) whether the petitioner has waived the attorney-client privilege by alleging ineffective assistance of trial counsel, and (2) if so, whether the waiver extends to trial counsel's communications with counsel for a codefendant notwithstanding his assertion of a joint defense privilege. This order holds that the waiver extends to both. The essence of this order is that when a claim of ineffective assistance of counsel is asserted in a collateral challenge to a conviction, all information to and from trial counsel plausibly relevant to the alleged acts or omissions is discoverable.

**STATEMENT**

Petitioner Katherine Paiz and her husband, Luis Gonzalez, were indicted for conspiracy and wire fraud arising out of a scam to collect insurance proceeds on a false claim. Their car was "stolen," then burned to a crisp, leading to their false claim to the auto insurer. The federal indictment accused both as responsible for all acts, including the use of fire. Significantly,

1   under 18 U.S.C. 844(h), anyone who uses fire to commit any federal felony must be sentenced
2   to ten years *additional* to the sentence for the felony.  Although they were indicted together,
3   their trials were severed.  Each pointed the finger at the other.  Both were convicted on all
4   counts, except — significantly — Gonzalez was acquitted on the use-of-fire count and thus the
5   husband avoided the ten-year add-on.  Petitioner was sentenced to 121 months.

6   　　　The severance and the circumstances leading up to the severance remain controversial in
7   this case.  The short version is that the Court granted a severance motion made by both defense
8   counsel so that Gonzalez, after being tried first, would testify to supposedly exculpatory
9   information in aid of his wife's defense.  Despite repeated assurances that petitioner's trial
10  counsel would call Gonzalez to testify and repeated assurances that he would in fact testify
11  (rather than invoke privilege), petitioner's trial counsel, after obtaining the benefit of the
12  severance, declined to call Gonzalez to the stand after all.  Once the severance was granted and
13  both trials were held, it became apparent that a motive for the severance was to allow each
14  defendant to point the finger at the other.

15  　　　The long version is as follows.  Petitioner was represented by Attorney Nina Wilder and
16  Gonzalez was represented by Federal Public Defender Dan Blank.  Petitioner moved to sever
17  the joint trial on the basis that her husband possessed exculpatory evidence for her.  He was
18  refusing to testify on her behalf at a joint trial.  Trial Attorney Wilder submitted a personal
19  declaration stating that "[Gonzalez] is willing unconditionally to testify in Ms. Paiz's defense at
20  a separate trial," and "I intend, without reservation or condition, to call him as a witness" (Dkt.
21  No. 46).  A hearing was held on the motion.  Trial Attorney Wilder stated, "[Gonzalez] is an
22  indispensable, favorable witness" and reiterated that "[he] is willing unconditionally to testify at
23  Ms. Paiz's separate trial" (Dkt. No. 223 at 16).  Gonzalez's attorney, FPD Blank, filed a
24  supplemental brief and an *ex parte* under-seal declaration in support of Paiz's motion.
25  Gonzalez confirmed that he would not testify in a joint trial.  He would testify, however, at a
26  separated trial regarding a telephone conversation he had with his wife shortly after she learned
27  that her car had been torched.  Gonzalez stated that he would describe her demeanor during the
28  conversation as being surprised, shocked, and distressed, which demeanor purportedly showed

2

that his wife did not plan or reasonably foresee the use of fire. FPD Blank was vigorous in supporting a severance.

For reasons of judicial economy, among others, the Court was initially reluctant to grant the motion. It initially denied the motion to sever (Dkt. No. 65). Although it did appear that Trial Attorney Wilder would call the husband at a severed trial and that he would in fact testify, the order found that the defendants had failed to show that his testimony would be "substantially exculpatory." A large part of Gonzalez's proffered testimony would be inadmissible under the hearsay rule. The exculpatory value of the remaining testimony would be marginal in the context of the charges and other evidence. Furthermore, Gonzalez's status as a convicted felon and Paiz's codefendant and husband cast substantial doubt on the credibility and value of his testimony. Finally, a joint trial would conserve judicial resources.

FPD Blank asked for reconsideration. He contended that telephone records proved that the husband's conversation with petitioner occurred immediately after she learned that her vehicle had been torched. Thus, he argued, the foundational requirement for contemporaneousness under Federal Rule of Evidence 803(3) would be satisfied and his testimony about petitioner's statement would be admissible under the state-of-mind exception to the hearsay rule. FPD Blank also claimed that the testimony would be substantially exculpatory of petitioner. Trial Attorney Wilder and Gonzalez submitted personal declarations. Trial Attorney Wilder firmly committed to calling Gonzalez as a witness and Gonzalez firmly committed to testifying.

In light of the stronger record, a tentative order granted the severance. It stated: "It appears definite that Mr. Gonzalez would supply testimony from which the jury could conclude that Ms. Paiz was genuinely surprised to learn that the car had been burned . . . At least some of the evidence . . . would be admissible under either Federal Rule of Evidence 803(2) or 803(3)" (Dkt. No. 78). Further argument was permitted. The government was adamant against a severance. In granting the severance, however, the Court reiterated that Gonzalez's commitment to testify for his wife was of importance (*see* Dkt. No. 363 at 27, 35–37). FPD Blank confirmed that his client would testify at the wife's trial (*id.* at 36–38). In light of the assurances from Trial Attorney Wilder, FPD Blank, and Gonzalez that the latter would

3

testify and would be called to exculpate his wife in a separate trial, a written severance order issued. At a later status conference, Trial Attorney Wilder again stated that she would call Gonzalez as a witness (Dkt. No. 226 at 7).

Gonzalez had confessed to the FBI and had specifically confessed to having torched the car. For her part, petitioner had also, separately, confessed to her involvement in the scheme, though not to having torched the car. Gonzalez's trial was set first. At a final pretrial conference, FPD Blank announced that Gonzalez would blame his wife for the scheme, if not for the use of fire. FPD Blank planned to show that Gonzalez falsely confessed solely to protect his wife (Dkt. No. 348 at 19–41). At the wife's trial, however, Gonzalez was still willing to provide the telephone-call exculpatory evidence (*id.* at 27). In essence, Gonzalez planned to inculpate his wife in his *own* trial and exculpate her in *her* trial. Trial Attorney Wilder stated that Attorney Blank's defense strategy would not affect her defense of her client; she still intended to call Gonzalez to testify (*id.* at 41).

In addition to the Paiz confession, Attorney Blank planned to use an application to plead open to the wire fraud counts earlier signed and filed by petitioner but on which she never followed through with any guilty plea. No plea colloquy ever began. No plea was ever entered. The application, therefore, need not have been filed, it being a mere supplement to ensure that any plea was voluntary and knowing. Once it was filed, however, FPD Blank insisted on its use as exculpatory of Gonzalez.

Upset, the government moved to undo the severance. In her response, Trial Attorney Wilder repeated that she definitely planned on calling Gonzalez as a witness (*see* Dkt. No. 160). She explained that it was too late to rejoin the cases without prejudicing her client; petitioner still relied upon Gonzalez to provide substantially exculpatory evidence. Trial Attorney Wilder had built her client's defense around this expectation (*see* Dkt. No. 164). Based thereon, the Court denied the government's order to rejoin. Gonzalez was tried first.

Gonzalez was convicted of the conspiracy charge and two counts of wire fraud. He was, however, acquitted of the use-of-fire charge and thus avoided the ten-year add-on. During the trial, Attorney Blank introduced the Paiz confession and application to plead guilty to the wire

4

1  fraud counts and argued throughout that she was the real culprit and that Gonzalez had falsely
2  confessed to setting the fire to protect her.

3  Petitioner's trial followed shortly thereafter. The government presented a more
4  streamlined case and also additional evidence to show that petitioner was aware that the car
5  would be burned. Then the government rested and it was Trial Attorney Wilder's turn to
6  present her defense. She announced that she would *not* call Gonzalez after all.

7  Trial Attorney Wilder explained: "[T]he bottom line is that if I were to put Mr. Gonzalez
8  on [the stand] . . . I would be ineffective. There would be, if not a mistrial, 2255" (Dkt. No. 351
9  at 3). Trial Attorney Wilder explained that she had reversed field in light of intervening
10 evidentiary developments, specifically matters that the government would raise on cross-
11 examination. The Court advised Trial Attorney Wilder that her foremost and only duty was to
12 represent her client to the best of her abilities in the then-extant circumstances, irrespective of
13 any prior representations to the Court.[1]

14 Suffice it to say, Trial Attorney Wilder never put Gonzalez on the stand. She told the
15 jury that her client conceded the first three counts but blamed the husband for the fire,
16 contending that there was insufficient evidence that petitioner was on notice of the use of fire in
17 advance. Petitioner did not testify. The jury convicted her on all four counts — including the
18 use-of-fire count. She is now serving a 121-month sentence.

19              *                  *                  *

20 Petitioner Katherine Paiz has now moved to vacate, set aside, or correct her sentence,
21 pursuant to 28 U.S.C. 2255. She is now represented by Attorney Katherine Alfieri, who will be
22 referred to as "2255 Counsel." Her petition argues that Trial Attorney Wilder provided
23 ineffective assistance of counsel at trial, because of: (1) various failures related to government
24 witness Regina DeGidio; (2) various failures related to not calling Gonzalez as a witness at
25 trial; (3) failure to adequately prepare, investigate, and interview witnesses; (4) failure to file a
26 motion for a new trial and/or for withdrawal as counsel; and (5) failure to obtain a post-

---

[1] There were two hearings on the matter, one on the public record with the government present and one with the government not present. Trial Attorney Wilder submitted a declaration under seal, which led to both hearings. The declaration and transcript of the under seal hearing were both unsealed along with the filing of the Section 2255 petition.

5

1  conviction cooperation agreement or safety-valve debriefing.[2] The first three grounds are broad
2  and cover most, if not all, of the trial.

3  In response, the government has applied for and was granted a subpoena to take the
4  deposition of and for the production of certain documents from Trial Attorney Wilder. The
5  subpoenaed documents included "all items which in any way refer or relate to the allegations of
6  ineffective assistance of counsel by Nina Wilder set forth in the Petition." Both the
7  government's rationale for seeking discovery and the motions to quash concern discovery
8  related to Trial Attorney Wilder's failure to call Gonzalez at trial, and not the other alleged
9  ineffective assistance grounds in the petition.

10  Gonzalez and petitioner, separately, moved to quash the subpoena. Without ruling on
11  the ultimate issue, a recent order set forth a procedure for an initial deposition of Trial Attorney
12  Wilder and the production of subpoenaed documents, through which the government (and FPD
13  Blank and 2255 Counsel, if they so chose) were permitted to test the existence and scope of any
14  privileges. That order also set a briefing schedule and hearing for the motions to quash. The
15  deposition went forward last December 9, and the government opposed the motions and
16  appended the transcript of that deposition. Gonzalez and petitioner have replied in support of
17  their motions, and the motions were heard on December 22.

18  The following individuals attended the deposition on December 9: Trial Attorney
19  Wilder, 2255 Counsel (Attorney Alfieri), FPD Blank, and AUSAs William Frentzen and Robert
20  Rees. It began with a discussion by all attendees concerning the expected large extent of
21  privilege objections from 2255 Counsel and FPD Blank. The deposition continued through
22  examination by the government in the same vein. FPD Blank and 2255 Counsel depended on
23  Trial Attorney Wilder to be the judge of when a question called for an answer including
24  supposedly privileged information, in which case she indicated as such and 2255 Counsel and
25  Attorney Blank readily objected and directed Trial Attorney Wilder not to answer. At the end
26  of the deposition, 2255 Counsel asked a small number of yes-or-no questions. Very little
27  information was given. Objections and instructions not to answer ruled the day.

---

[2] Although it would appear from the face of the petition and memorandum of points and authorities in support that a larger number of claims are asserted, these are more accurately the categories of claims asserted.

6

1    Turning to the motions at hand, Gonzalez moves to quash or modify the subpoena on the
2 ground that the subpoena encompasses material that is subject to a "joint defense privilege."
3 Gonzalez argues that he and his counsel, FPD Dan Blank, and petitioner and Trial Attorney
4 Wilder, had an oral joint defense agreement from the beginning of the case through the trials,
5 according to which they shared confidential information and strategy.  Gonzalez states that the
6 subpoena should either be quashed altogether or modified to exclude the disclosure of any
7 content of communications between Trial Attorney Wilder and either Gonzalez or his counsel.
8    For her part, petitioner argues that an order quashing or modifying the subpoena is
9 necessary because a waiver of attorney-client privilege by a petitioner under Section 2255
10 should be construed narrowly and the terms of the government's subpoena are too broad.  She
11 also states that discovery pursuant to the subpoena is "unnecessary" for a government response
12 to the petition.

## ANALYSIS

14    The main holding of this order is that once a claim of ineffective assistance of counsel is
15 asserted on collateral attack of a conviction, all information to and from trial counsel plausibly
16 relevant to the alleged acts or omissions is discoverable regardless of to whom or from whom
17 the information was directed.  Petitioner has chosen to assert a claim of ineffective assistance of
18 counsel.  As such, she has waived her attorney-client privilege concerning all communications
19 with her trial counsel preceding and during her trial relevant to her claim.  Moreover, Gonzalez
20 may not muzzle trial counsel and prevent the trier of fact from learning all information known
21 to petitioner's trial counsel and all investigative steps taken by petitioner's trial counsel, so that
22 the professional conduct of trial counsel can be fully and fairly examined on the alleged acts
23 and omissions.

### PETITIONER'S MOTION

25    When a Section 2255 petition asserts ineffective assistance of counsel, the normal
26 attorney-client privilege for all communications on the subject of the alleged ineffective
27 assistance is waived:

28    > It has long been the rule in the federal courts that, where a habeas petitioner raises a claim of ineffective assistance of counsel, he waives the attorney-client privilege as to all communications with his allegedly ineffective lawyer.

7

*Bittaker v. Woodford*, 331 F.3d 715, 716 (9th Cir. 2003).

Although this quoted passage used the phrase "as to all communications," another passage in *Bittaker* placed an outer limit on the waiver:

> [T]he court must impose a waiver no broader than needed to ensure the fairness of the proceedings before it. Because a waiver is required so as to be fair to the opposing side, the rationale only supports a waiver broad enough to serve that purpose. Courts, including ours, that have imposed waivers under the fairness principle have therefore <u>closely tailored the scope of the waiver to the needs of the opposing party in litigating the claim in question</u>. *See, e.g.*, *Kerr v. U.S. Dist. Court*, 426 U.S. 394, 405, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976) (recognizing the need to ensure that the "balance between petitioners' claim[ ] of ... privilege and plaintiffs' asserted need for the documents is correctly struck"); [*United States v. Amlani*, 169 F.3d 1189, 1196 (9th Cir.1999)] (holding that "<u>only those documents or portions of documents relating to the [claim asserted by the client] [should be] disclosed</u>"); *Greater Newburyport Clamshell Alliance v. Pub. Serv. Co.*, 838 F.2d 13, 22 (1st Cir.1988) (holding that the client need reveal only information "for which defendants have so far shown a true need and without which they may be unfairly prejudiced in their defense"); *see also* Mueller & Kirkpatrick § 5.31, at 553 (suggesting that "in applying the doctrine of implied waiver by claim assertion, courts must be careful to target only" those privileged materials without which the adverse party would be unfairly prejudiced).

*Id.* at 720–21 (underlines added).

Turning to the instant petition, the allegations of ineffective assistance are quite broad and pervasive. Again, the petition asserts that Trial Attorney Wilder provided ineffective assistance of counsel at trial, because of: (1) various failures related to government witness Regina DeGidio; (2) various failures related to not calling Gonzalez as a witness at trial; (3) failure to adequately prepare, investigate, and interview witnesses; (4) failure to file a motion for a new trial and/or for withdrawal as counsel; and (5) failure to obtain a post-conviction cooperation agreement or safety-valve debriefing. Among more specifically tailored arguments, the petition makes statements of general deficiency, such as, "trial counsel was completely and utterly unprepared for trial."

Given this breadth, the scope of the waiver is correspondingly broad in this case. Certainly, it constitutes a waiver as to any attorney-client communications bearing on Gonzalez as a witness, his direct testimony, his cross-examination liabilities, his truthfulness, all of which would, in turn, open up Gonzalez's actual role in the crime, not to mention his prior felonies available for impeachment. Given the broad IAC allegations, the waiver also extends well beyond Gonzalez and to all of the enumerated acts and omissions set forth above.

8

1    The questions asked at the deposition dealing with communications with petitioner
2 should have been answered completely without evasion.  It was improper to stonewall on these
3 questions.  Trial Attorney Wilder should return to the deposition room and answer all such
4 questions and any others fairly within the rulings in this order.

5    Petitioner resists this conclusion, asserting that the prosecutors do not "need" to inquire
6 into those communications.  Petitioner goes so far as to say that the failure to call Gonzalez was
7 *per se* ineffective and that no amount of inquiry into trial counsel's deliberations could salvage
8 the wrong.  Therefore, it is said, there is no need for further inquiry.

9    It does not work that way.  2255 Counsel has had the benefit of the full file of trial
10 counsel, access to petitioner, and has taken many months to frame her petition.  Now it is the
11 government's turn to learn all facts that might plausibly show the decision to rest without
12 calling Gonzalez was a reasonable trial strategy.  Trial Attorney Wilder may have had good
13 reasons for not calling Gonzalez.  Those reasons might have been specific to Gonzalez or more
14 generally anchored in other trial developments (or some combination).  The reasons might even
15 have been based on instructions from the client.  Information learned by counsel as to potential
16 perjury may have been at work.  Trial Attorney Wilder may have been ethically restrained from
17 pursuing the course that 2255 Counsel now posits as essential.  There are many possible
18 explanations.  The government is entitled to a fair opportunity to learn the true facts so as to
19 show that Trial Attorney Wilder acted reasonably in the circumstances known to her then.  The
20 government is not required to acquiesce in 2255 Counsel's *ipse dixit* pronouncement that Trial
21 Attorney Wilder utterly failed her client so badly that discovery could reveal nothing to save the
22 day.  Petitioner's objections are overruled.

**JOINT DEFENSE OBJECTION BY GONZALEZ**

24    Gonzalez objects to any inquiry that would reveal information learned by Trial Attorney
25 Wilder from the Gonzalez defense team.  This objection is based on a "joint defense privilege."
26 For example, if the Gonzalez defense team advised Trial Attorney Wilder of certain facts
27 Gonzalez would have to admit upon cross-examination, that advice must remain secret, the
28 objection asserts, even if that very information led trial counsel to decide against calling
Gonzalez to the stand.  This surely cannot be the law.  Rather, the law must be that discovery is

9

allowed to all information, whether joint defense or not, that plausibly informed trial counsel on the acts or omissions alleged in the petition. No decision cited or known to the Court has ever blocked an inquiry by the government in a Section 2255 case into such information.

Putting aside momentarily whether the record shows any oral joint defense agreement (there was clearly no written agreement), this order now turns to the more fundamental question whether, even if one existed, could it now block inquiry by the government into the information known by (and statements made by) trial counsel when she pursued the various acts and omissions now challenged as ineffective? This order answers no.

*       *       *

A "joint defense privilege" is "an extension of the attorney-client privilege. . . . A joint defense agreement establishes an implied attorney-client relationship with the co-defendant." *United States v. Henke*, 222 F.3d 633, 637 (9th Cir. 2000) (citations omitted). However, "[c]ourts have consistently viewed the obligations created by joint defense agreements as distinct from those created by actual attorney-client relationships. . . . [N]o cases recogniz[e] joint defense agreements as creating either a true attorney-client relationship or a general duty of loyalty." *United States v. Stepney*, 246 F. Supp. 2d 1069, 1079–80, 1083 (N.D. Cal. 2003) (Judge Patel) (citations and footnote omitted) (explaining that anything else "would create a minefield of potential conflicts"). Furthermore, a "joint defense" is also distinct from joint representation. As another court has explained, also in the context of a Section 2255 motion:

> A joint defense agreement is not synonymous with common representation. While common representation creates an attorney-client relationship between common counsel and each defendant being represented by them, a joint defense agreement is a mechanism designed to provide confidentiality for communications made during joint defense strategy sessions. *Each defendant, however, retains his own attorney, and the duty of loyalty only extends from each attorney to the defendant which he represents.*

*Beras v. United States*, No. 99 CR 75(SWK), 2007 WL 195352, at *2 (S.D.N.Y. Jan. 24, 2007) (Judge Kram) (emphasis added).

The "joint defense privilege" is designed to facilitate communication among joint parties regarding matters that are important to protect their interests in litigation. *The concept of a joint defense is not technically a privilege in and of itself but instead constitutes an exception to the*

10

*rule on waiver where communications are disclosed to third parties. See Continental Oil Co. v. United States*, 330 F.2d 347, 350 (9th Cir. 1964).[3] A joint defense agreement can be written or oral, but "[j]oint defense agreements are not contracts which create whatever rights the signatories chose, but are [] notice of defendants' invocation of privileges set forth in common law. Joint defense agreements therefore cannot extend greater protections than the legal privileges on which they rest." *Stepney*, 246 F. Supp. 2d at 1079–80 (footnote omitted).

Gonzalez's motion depends heavily on a decision by our court of appeals in *United States v. Henke*, 222 F.3d 633, 638 (9th Cir. 2000). That decision reversed a district court in part because it improperly had denied a motion to withdraw by counsel, despite a conflict of interest that constrained counsel from cross-examining an important government witness. *Id.* at 638. At its core, *Henke* was a decision about conflicts that required withdrawal of trial counsel. It was not a decision about how to determine whether a joint defense agreement exists, or about disclosure of information in the face of such an agreement. Contrary to Gonzalez, there is no indication in *Henke* that the assertion of a joint defense agreement forever blocks the subsequent disclosure of the content of communications between defense teams.

This order holds that when ineffective assistance of counsel is asserted in a Section 2255 petition, trial counsel must testify to *all* information known to her at the time of her alleged acts or omissions, regardless of source, so long as the information has plausible relevance to the alleged ineffectiveness. This means that any information learned by trial counsel via a joint defense agreement is discoverable to the extent the information was plausibly relevant to the alleged acts or omissions. The reason is obvious: once all information known to the decisionmaker is in full view, the decision challenged may be vindicated as in accord with good practice. On the other hand, to hide some of that information would skew the picture and might make the actual decision look better or worse than it really was. True, during the prosecution

---

[3] In consideration of whether to compel compliance with subpoenas issued by a grand jury, where it was "asserted by the United States that the attorney-client privilege, if such originally existed in respect to these memoranda, was waived when counsel for the two groups of appellants exchanged memoranda," the court of appeals held: "The privilege asserted here is a valuable and an important right for the protection of any client at any stage of his dealings with counsel. It is a vital and important part of the client's right to representation by counsel. We think that to make the limitations on this right sought to be urged by the United States would tend in substantial measure to destroy the privilege." The court thus quashed the subpoenas. *Id.* at 349–50.

11

itself, this means that defense counsel should be careful in what they say to each other, for someday a codefendant may let the sun shine in on that information via a collateral attack on a conviction. But that is the only fair result when a conviction is sought to be overturned on grounds of ineffective assistance. No decision has ever ruled to the contrary as far as this Court can determine.

As discussed above, a joint defense agreement does not create a duty of loyalty to an individual who is not one's own client, and it is not the same as joint representation. Again, it is not technically a privilege in and of itself but instead constitutes an exception to the rule on waiver where communications are disclosed to third parties. *See Hunydee v. United States*, 355 F.2d 183, 185 (9th Cir. 1965). In other words, if attorney-client communications — *e.g.*, a statement from a client to his counsel — are made in the presence of a codefendant and his or her counsel, privilege over such communications are not waived because they were made in the presence of others. But this does not create a privilege *held by the codefendant* over communications made by him to counsel that is not his own.

Instead, communications between counsel, or from one defendant to a counsel not his own, are more appropriately characterized as *work product* communications, intended to aid in preparation for litigation. And it is well-known that "[t]he privilege derived from the work-product doctrine is not absolute." *United States v. Nobles*, 422 U.S. 225, 239 (1975). Furthermore, the waiver that applies where a habeas petitioner raises a claim of ineffective assistance of counsel, "applies equally to the work product privilege." *Bittaker*, 331 F.3d at 722 n.6. Hence, having asserted her claim of ineffective assistance of counsel, petitioner has impliedly waived her work product privilege, just as she has the true attorney-client privilege over communications with her Trial Attorney Wilder. To the extent Gonzalez has any cognizable work-product privilege in communications between the two defense teams, this order holds that there is the required "necessity and unavailability by other means" for discovery of such work product, as discovery is vital to the resolution of the petition. *McKenzie v. McCormick*, 27 F.3d 1415, 1420 (9th Cir. 1994) (citation omitted); *cf.* Fed. R. Civ. P. 26(b)(3). Also, his need for any secrecy has greatly diminished by virtue of the fact that he cannot now be re-prosecuted.

12

At the hearing on the instant motions, FPD Blank argued that Gonzalez's "privilege" over any communications from the Gonzalez defense team to Trial Attorney Wilder is inviolate, stressing the word "privilege" and reminding us that secrecy is the price paid for all privileges. But, as stated, we are not concerned with a true privilege. "[T]he obligations created by joint defense agreements [are] distinct from those created by actual attorney-client relationships." *Stepney*, 246 F. Supp. 2d at 1080, 1083. More to the point, we must, in fact, balance a claim of privilege against the consequences of disclosure in the context of a collateral attack to a criminal conviction.

In *Bittaker*, our court of appeals set forth that, in such context, consideration of fairness and balancing *is* required. This followed from the principle that waiver of privilege in the habeas context must be found to be implied by the court and is not an express waiver in the exclusive province of the waiving party. 331 F.3d at 720–21. Although *Bittaker* balanced *petitioner's* claim of privilege against the need for discovery, that same need for consideration of fairness exists where someone other than petitioner asserts that claim. Safeguarding privileged information is guided by our knowledge that doing so is "in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure." *Hunt v. Blackburn*, 128 U.S. 464, 470 (1888). We know that Gonzalez faces *no* consequences from disclosure. His trial is over. Jeopardy attached. He cannot be re-prosecuted. (Indeed, the whole point of his trial going first was so that, post-verdict, he could and would testify, no longer being at risk.) Even if he could be prosecuted, a protective order has been entered herein and the government, nor any other party, can use the information learned in this proceeding elsewhere. Yet there is a strong need for discovery, for without it the petition cannot be fully and fairly resolved.

Here, it may well be that Trial Attorney Wilder learned late information from the Gonzalez defense team that made calling Gonzalez inadvisable. Trial Attorney Wilder did state that before deciding not to call him, she did have a communication with the Gonzalez defense team. Presuming for the moment that Trial Attorney Wilder acted professionally, it could well be that she learned that, although Gonzalez would stand by his declaration (as far as it went)

1  about the telephone call and petitioner's demeanor, he would have to testify, on cross-
2  examination, to incriminating statements made by petitioner to Gonzalez or to some other
3  inculpatory facts adverse to petitioner. In such circumstances, Trial Attorney Wilder may have
4  acted entirely responsibly in resting without calling Gonzalez, feeling that more harm than good
5  would be done by parading Gonzalez before the jury.

6  The implications of FPD Blank's argument are staggering. What if a lawyer learned, via
7  a joint defense agreement, of unimpeachable exonerating evidence and failed to pursue it?
8  Would FPD Blank then say that a later Section 2255 petition cannot rely on the failure to follow
9  up on joint defense information? FPD Blank's theory would bar such use. But surely we could
10 not tolerate such an injustice. And if a petitioner could use it, then so can the government
11 (when it cuts the other way), for otherwise there would be the most unfair problem of selective
12 waiver.

13 At the hearing, FPD Blank conceded that petitioner was the "holder" of the "privilege"
14 and could (and did by seeking Section 2255 relief) waive the privilege, but he insisted that the
15 waiver extended only to subparts of the joint communications. If, he said, Paiz had said "xxx"
16 to her counsel and her counsel had then passed it on to Gonzalez's counsel, the first "xxx"
17 would be discoverable but not the second. Conversely, he said, if Gonzalez's counsel had said
18 "yyy" to petitioner's counsel and her counsel had then passed it on to petitioner, the second
19 "yyy" would be discoverable but not the first. This elaborate structure collapses from its own
20 weight. It is unworkable. It would cause information actually known to trial counsel to be
21 discoverable or not on the happenstance of whether or indeed how much was passed on to the
22 client. Indeed, under this theory, if both clients and both lawyers had a four-way conversation,
23 all of it would be discoverable under FPD Blank's theory (because petitioner heard it all), but if
24 petitioner happened to step out of the room, then none of it would be discoverable, as least if the
25 Court grasps the nub of the theory. Can it really be that getting at the truth of what happened
26 could turn on such thin distinctions? No decision has ever blessed FPD Blank's elaborate
27 theory and this one declines to be the first.

28 To this complicated analysis, a simple answer is that we should treat all information
provided to petitioner's counsel as having been provided to petitioner as well. Then, even by

14

FPD Blank's own lights, everything is discoverable. This treatment is entirely consistent with the whole point of a joint defense arrangement, for it is designed to benefit the accused, not the lawyers.

Finally, it will not do for Trial Attorney Wilder now to assert that she did not specifically base her decision on the communication and thus decline to testify about it, for a trier of fact might decide that the communication was at least an informing event. An IAC expert may well be persuaded that the communication counseled in favor of the course taken even if the communication was not, by itself, the sole or predominant consideration. If it was plausibly relevant to the decision (or omission) then discovery into it must be allowed.

Communications made by Trial Attorney Wilder *to* the Gonzalez defense team are also discoverable so long as they plausibly bore on her decisionmaking at issue. For example, if she said to FPD Blank: "I am concerned over the negative points that might come out on the cross-examination of Mr. Gonzalez. Have you told me all the possible negatives?", then this comment would be evidence that Trial Attorney Wilder was acting responsibly in trying to estimate the pros and cons of calling Gonzalez. Even though it was a statement/question by her — and not information received by her — it would be discoverable because it would go to reconstructing her degree of professionalism in the challenged conduct. Indeed, every step in her due diligence in deciding whether to call or not call Gonzalez should now be an open book.

The joint defense objection is overruled and Trial Attorney Wilder will return to the deposition room and answer all questions consistent with the rulings herein and shall produce all documents that plausibly informed all acts and omissions challenged in this Section 2255 proceeding. FPD Blank has no standing to object and may not participate in the deposition, although since it is a public proceeding, he may attend and watch.

### WAS THERE A JOINT DEFENSE AGREEMENT BARRING DISCLOSURE ON A SECTION 2255 PETITION?

Although the foregoing is dispositive, the reader will understand that this order has assumed for the sake of argument that there was a joint defense agreement and, more to the point, that it called for secrecy even in the event of Section 2255 proceedings.

15

The actual record is too thin to go this far. There was no written agreement. There was not even an express oral joint defense agreement. At most, there was an implied joint defense agreement, one arising from a course of conduct. Sometimes trial lawyers consciously leave the outer perimeters of such arrangements vague, especially when their interests are adverse on some issues and common on others. So, while it seems plausible here that both counsel accorded most exchanged information a degree of confidentiality, they left the outer limits of their arrangement vague. Significantly, for our purposes, no agreement was shown as to whether information exchanged was barred from use for or against a subsequent Section 2255 petition, much less barred from use years after the Gonzalez conviction occurred and the need for secrecy was diminished. Put differently, if lawyers wish to classify their pretrial communications as Top Secret Forever and never to be useable for or against a Section 2255 petition, they should say so plainly and clearly, for such an arrangement may well be against the interests of their own clients, if not public policy. No such clear and plain proviso was proven here.[4]

Much ink and breath have been expended over whether or not a joint defense agreement should be presumed or implied and, if so, cover (or not) our present Section 2255 scenario. When it comes to creating an agreement by implication, there is no standardized joint defense agreement. Variations exist. The terms are usually negotiable and are in fact negotiated. There is no uniform template that we can impress upon our situation. In this exercise, counsel would draw the Court into a true mess of "he said she said" as to what specifics were intended. This imbroglio would lose sight of the larger picture, namely that the proper administration of justice requires that all communications involving petitioner's trial counsel be learned so that we can determine whether she was provided effective assistance of counsel.

At all events, the main holding of this order is that no joint defendant agreement, no matter how plain and clear, should or can be allowed to bar discovery or use of pertinent communications to and from trial counsel in a later Section 2255 proceeding. This applies both

---

[4] FPD Blank is wrong in asserting that *Hunydee v. United States*, 355 F.2d 183 (9th Cir. 1965), establishes a "presumption" of a joint defense privilege in the absence of an actual agreement. The cited hornbook should be corrected in the next edition.

ways.  The convicted client can use them to show ineffectiveness.  The government can use them to show effectiveness.

**CONCLUSION**

For the foregoing reasons, both petitioner's and Gonzalez's motions to quash are **DENIED**.  On or before January 21, 2011, Trial Attorney Wilder shall return to the deposition room and answer all questions that plausibly relate to the accused acts and omissions.  She and petitioner's counsel shall produce to the government Trial Attorney Wilder's entire file on the matter save and except for those materials having no plausible relationship to the accused acts and omissions.  All of this evidence shall be taken subject to the existing protective order.  FPD Blank shall preserve all evidence, including e-mails, memoranda, letters, and notes that bear on the problem in case those are eventually needed.  This relief is found to be the narrowest relief appropriate under the *Bittaker* decision.

If FPD Blank files his application for interlocutory appeal on or before January 10, 2011, then this order shall be deemed stayed pending further order.  If FPD Blank does not appeal, the government shall have until **FEBRUARY 22, 2011**, to file its opposition to the petition, and petitioner shall have until **MARCH 22, 2011**, to reply.

**IT IS SO ORDERED.**

Dated:  December 23, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE